**GILA RIVER PIMA–MARICOPA INDIAN COMMUNITY et al.**

v.

**The UNITED STATES.**

**Appeal No. 14–72.**

United States Court of Claims.

April 17, 1974.

Nichols, J., filed concurring opinion.

Alfred S. Cox, Phoenix, Ariz., for Gila River Pima-Maricopa Indian Community et al.; Z. Simpson Cox, Phoenix, Ariz., attorney of record. Cox & Cox, L. J. Cox, Jr., George S. Livermore, Stephen L. Cox, Phoenix, Ariz., Ira I. Schneier, C. M. Wright, Samuel P. Goddard, Jr., Tucson, Ariz., Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

David M. Marshall, Washington, D. C., with whom was Asst. Atty. Gen., Wallace H. Johnson, for the United States.

Before DAVIS, SKELTON and NICHOLS, Judges.

## ON APPEALS FROM THE INDIAN CLAIMS COMMISSION

DAVIS, Judge.

These are interlocutory cross-appeals from a ruling of the Indian Claims Commission setting the date of extinguishment of aboriginal title to an area in south-central Arizona previously found by the Commission to have been held by the Pima-Maricopa Indians (see 24 Ind. Cl.Comm. 301 (1970)). Neither side challenges, on these appeals, the extent of the acreage determined to have been held by Indian ownership; the only issue now before us is the date of "tak-

ing" (in the non-eminent-domain sense) by the Federal Government.[1]

The Pimas [2] and Maricopas are two distinct tribes who have lived together along the Salt and Gila Rivers, in Arizona, since prehistoric times. Although speaking different languages, the two tribes form one unit for political, social, economic and military purposes, and have long cooperated in their use and occupation of the land. Before contact with whites, the Indians had developed successful irrigation techniques for farming, and had also established permanent villages and cultivated fields along the river banks. In spite of their generally sedentary nature, they used and occupied a large surrounding area.[3] In an average year, farming produced only about one-half the tribes' subsistence, and the remainder was obtained by groups which travelled substantial distances to gather wild vegetation and fuel, as well as to hunt and fish, and also for grazing.

This ancestral homeland of the Pima-Maricopas came under United States sovereignty through the Treaty of Guadalupe Hidalgo in 1848 (acquiring from Mexico the portion north of the Gila River), and the Gadsden Purchase of 1853 (south of the river). The Indians were distinguished by their consistently friendly attitude toward whites, before and during the period of American migration and settlement. This characteristic was well known, and was remarked upon in Congress. Cong.Globe, 35th

Cong., 2d Sess. 735 (1859) (Sen. Sebastian).

In 1859, Congress ordered that a reservation not to exceed 100 square miles be established for these two tribes. The specific location was to be determined by a survey (later promptly made) of the existing Pima-Maricopa villages. From 1876 to 1915, the Gila River Reservation was enlarged seven times by Executive Order of the President, the largest single addition coming in 1883 when President Arthur doubled its size from 180,000 to 360,000 acres, bringing it almost to its present-day extent (372,000 acres). (The reservation was at all times much smaller than the aboriginal area awarded below. *See* note 3, *supra.*)

During this period, white settlers established themselves in Arizona. The Civil War slowed migration for a while, but thereafter it resumed in good measure. In 1873 Congress set up the Gila Land District, which included almost all the lands occupied by the Pima-Maricopas. Act of February 18, 1873, 17 Stat. 465. In the same year, a land office was established at Florence, within the award area.[4] But the finding below was that, by the mid-1880's, the amount of land patented at the Florence office had only minimal effect on Pima-Maricopa aboriginal title.[5]

Evaluating all the circumstances, the Commission found that the Pima-Maricopa aboriginal land was "taken" by the United States on the date of the 1883

1. In giving the background, we borrow from the opinion and findings of the Indian Claims Commission in the prior phase of the case (24 Ind.Cl.Comm. 301 (1970)), without prejudice to whatever right the parties may have to dispute those rulings and findings in a later appeal or aspect of the case. The briefs of neither side challenge, on the present appeals, any of the Commission's subsidiary findings as unsupported by substantial evidence.

2. "Pima" can refer to other Indian tribes, and is in addition descriptive of a linguistic group. The specific Indians involved here are the Gila River Pimas, also known as Gilenos.

3. The Commission found, in the earlier proceeding, that they exclusively used and occupied a region of some 3,751,000 acres (the award area). This figure is not challenged on these appeals.

4. The first land office in what is now Arizona had been established a few years earlier at Prescott.

5. By the mid-1880's about 140,000 acres had been patented at Florence. The aboriginal award area determined below was 3,751,000 acres in size. *See* note 3, *supra*. Even assuming that all tracts patented at Florence were in Pima-Maricopa country, this amounts to a disposition of less than 4% of their territory.

Executive Order, except for individual tracts entered by white settlers before that time (these tracts were held to have been "taken" at the date of entry). 27 Ind.Cl.Comm. 11 (1972).

Both sides are dissatisfied with the 1883 date. The Pima-Maricopas urge that the land was acquired on a parcel-by-parcel basis through the entry of white settlers, until the establishment of districts under the Taylor Grazing Act of 1934, 48 Stat. 1269, effected (they say) a complete extinguishment of all their remaining Indian title. The Government counters that the Congressional authorization of the 1859 reservation was a clear and complete expression of the legislative purpose to end the Indians' aboriginal title in all the award area outside the reservation as then contemplated. Alternatively, defendant suggests that the 1873 creation of the Gila Land District is a more logical date than that of the 1883 Executive Order.

■ The base-line in this area of the law is, of course, the supremacy of Congress over matters of Indian title based on aboriginal possession. United States v. Santa Fe Pacific R. R., 314 U.S. 339, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941); Oneida Indian Nation v. County of Oneida, 414 U.S. 661 at 670–674, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); Turtle Mountain Band of Chippewa Indians v. United States, 490 F.2d 935, 945–947, 203 Ct.Cl. —— (1974). In *Santa Fe*, the Supreme Court also admonished against lightly implying extinguishment of aboriginal ownership. 314 U.S. at 354, 62 S.Ct. 248. It is important, too, to recognize, as we stressed in *Turtle Mountain Band, supra,* the dominating impact of the particular circumstances and particular history in appraising when the specific land was "taken" by Congressional action or authorization.

■ Applying these guidelines, we cannot accept the Government's point that the establishment of the Gila River Reservation in 1859 extinguished at that time the Indians' ownership of all their other lands. The available indices of Congressional intent do not warrant such a conclusion. The provisions setting up the reservation, a rider to an Indian Department appropriations bill, "authorized and required" the President "to cause to be surveyed * * * the tract or tracts of land lying on or near the Gila River, in the Territory of Arizona, New Mexico, now occupied by the confederated bands of Pima and Maricopa Indians * * * " and to set aside the surveyed area as a reservation. Act of February 28, 1859, 11 Stat. 388, 401, § 3–4. The reservation was not to exceed 100 square miles. *Ibid,* § 4. Nothing is said about extinction of Indian title or cutting off the Indians from other territory they were using. The very next section of the statute appropriated $10,000 for "suitable presents to the Pimas and Maricopas, in acknowledgement of their loyality to this government and the many kindnesses heretofore rendered by them to our citizens." *Ibid,* § 5.

The Senator who proposed the amendment in its initial form spoke of its goals in this way: "to survey off a small reservation which shall embrace [Pima-Maricopa] villages * * *. It is but ordinary justice to secure them the homes on which they reside, and this amendment proposes to go no further." Cong.Globe, 35th Cong., 2d Sess. 735 (1859) (Sen. Sebastian). A joint conference committee later added the 100-square-mile-maximum provision. In reporting the conference committee recommendations to the House, a Congressman said: "The committee were of the opinion that some section of country should be marked out as their locality. They thought it best, however, to restrict them to a section of country not exceeding one hundred square miles." Cong. Globe, 35th Cong., 2d Sess., 1407 (1859) (Rep. Greenwood). The same member praised the Pima-Maricopas for aiding white settlement by keeping hostile bands at a distance (perhaps indicating an intention not to confine these Indians strictly on their reservation). *Ibid.* These and other legislative comments

are consistent with a purpose to encompass those Pima-Maricopa lands which embraced and surrounded the then villages, without cutting off the Indians from the additional lands used for hunting, foraging and grazing.

In this connection, the Indian Claims Commission thought it significant that these Indians were friendly and nonnomadic—so friendly and helpful that Congress gave them a special present in the 1859 Act, *see supra*—and that no attempt was made by the Government to remove or confine them on the reservation, so as to end their use and occupancy of other land. A far more probable design to attribute to Congress was deemed to be the desire to protect Pima-Maricopa villages and the surrounding fields from incursions by white settlers. These are reasonable inferences. As the Commission found, the Pima-Maricopa groups continued to use and occupy lands outside the 1859 reservation, as they had done before, and Government agents with knowledge of this use did not interfere with their activities.

It is revealing, too, that from 1876 to 1915 the President consistently enlarged the reservation, with Congress's acquiescence, in order to include more and more of the tracts being used and occupied by the Indians.[6] As a result of increased white settlement after the Civil War the Indians' farming activities suffered through a lack of water, and (as the Commission found) they "began to move their villages and farming activities to other portions of their aboriginal lands * * *. To protect the Pima-Maricopa farm lands in these areas from intrusions by white settlers further portions of their aboriginal lands were reserved by the Executive Orders of August 31,

1876 (1 Kapp. 806) and June 14, 1879 (1 Kapp. 806, 807). Further enlargements of the Gila River Reservation were accomplished between 1879 and 1883 by Executive order." 27 Ind.Cl. at 18. *See, also,* for more detail, 24 Ind.Cl. Comm. at 334. On similar grounds the Salt River Indian Reservation of 46,627 acres was created for them by Executive Order in June 1879. These regular increases in the lands formally set aside for the Pima-Maricopas—because the Government recognized that they were continuing to use and occupy those additional areas—are quite inconsistent with defendant's postulate that Congress abolished their Indian ownership (outside of the original reservation) in 1859 once and for all.

■ The defendant's countervailing arguments are not weighty enough to swing the balance in its favor. Various passages in the 1859 Congressional Globe are cited but, even with the greatest hospitality to the Government's point of view, the Congressional comments at the time the 1859 Act was passed are equivocal at the very best. The same is true of other official observations at the time. Defendant also emphasizes a number of other cases in which the Commission has held the establishment of a reservation to put an end to aboriginal title to land outside, but the opinion below rightly points out that the circumstances in those instances were markedly different.[7] There is no Procrustean rule that the creation of a reservation rigidly stamps out aboriginal rights. *Cf.* Turtle Mountin Band of Chippewa Indians v. United States, *supra,* 490 F.2d at 945–947, 203 Ct.Cl. at ——.

On this point, defendant calls upon the Arizona Supreme Court case of United States v. Certain Property, 1

---

6. The Commission found (24 Ind.Cl.Comm. at 333): "From its inception the original reservation was objected to by the Pimas and Maricopas because it did not encompass all of their fields, villages or fishing areas. It further restricted their access to irrigation waters and it did not include pasture land for their stock. The reservation did not include the broad Gila and Salt River

Valleys which they had always considered to be their tribal lands."

7. We do not pass upon the correctness of those earlier decisions on their own facts but merely note our concurrence with the Commission that, in any event, the situations presented there were not at all the same as here.

Ariz. 31, 25 P. 517 (1871), for the holding that establishment of this reservation destroyed Indian title to all other Pima-Maricopa land. The outcome hinged on whether a certain trading store was located in "Indian country" under the Trade and Intercourse Act of 1834, 4 Stat. 729. The store was within the award area but outside the Gila River Reservation. The court first rests its conclusion on the ground that, since the store was within a white settlement and the establishment of such a permanent settlement is incompatible with Indian title, the store was not within "Indian country". Thus far, as the claimants say, the Arizona court does not conflict with the Commission's findings below, because the latter held the date of entry by whites to be the date of taking for settled tracts. But the court goes on to say by way of *dictum* that "An Indian reservation and an Indian country are so far legal equivalents that the laws of the United States regulating trade and intercourse with the Indians apply alike to both." 25 P. at 520. As indicated in *Turtle Mountain Band, supra*, we cannot swallow this concept whole—if it means that Indian title cannot exist outside of a reservation—because the Supreme Court of the United States in *Santa Fe, supra*, has refused to equate the establishment of a reservation with the extinguishment of Indian title. Neither does this *dictum* carry much weight as applicable to this particular reservation; it is unaccompanied by an examination of Congressional intent or an analysis of the circumstances surrounding the creation of the Gila River Reservation.

 Defendant also urges that the throwing open of the aboriginal award area to white settlement—including the formation of the Gila Land District and the opening of the Florence office (mentioned above)—shows a belief by the then Government officials that Indian title had been extinguished by the setting up of the 1859 reservation. But surveying an area, or other acts preparing for white settlement, do not of themselves affect aboriginal title. Plamondon v. United States, 467 F.2d 935, 937–938, 199 Ct.Cl. 523, 528–529, (1972), *see also Id.*, 467 F.2d at 938–939, 199 Ct.Cl. at 530–531 (Davis, J., concurring in part and dissenting in part). The expectation of future parcel-by-parcel settlement would not, alone, extinguish Indian ownership. *Cf.* Lipan Apache Tribe v. United States, 180 Ct.Cl. 487, 494 (1967). Cases such as Alcea Band of Tillamooks v. United States, 59 F. Supp. 934, 103 Ct.Cl. 494, 560–561 (1945), aff'd, 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29 (1946), and Pillager Bands of Chippewa Indians v. United States, 428 F.2d 1274, 1278, 192 Ct.Cl. 698, 705 (1970), declare no more than that (a) authorized settlement is one factor to be taken into account in determining when Indian title ceased, and (b) "[i]n an appropriate factual context" (as the Commission put it below, 27 Ind.Cl.Comm. at 14) the opening up of an area for settlement can be tantamount to the ending of aboriginal title over the whole region. In the present case, the various factors (including the small percentage of Pima-Maricopa land actually entered) do not add up to the latter conclusion at any date before 1883.[8]

The wording of the Executive Orders which expanded the reservation has also been noted by the Government as revealing that the issuing Presidents thought that Indian title to non-reservation lands had already been extinguished. Typical phrases are that the described lands are "withdrawn from sale and settlement" or "withdrawn from the public domain"; this language is said to show a belief that the territory was considered to be public land which was then being granted to the Indians. It is much more likely,

---

8. For the same reasons, we reject the Government's secondary argument that, if the 1859 date is unacceptable, the establishment of the Gila Land District in 1873 should be selected as the time of taking. The District, at most, indicated the prospect and expectation of future white settlement, not a definite, present intention to abolish remaining Indian title.

however, that these verbal formulae reflect the legislative authority the President was acting under. The Pre-emption Act of 1841, 5 Stat. 453, 456, excepted from its operation " * * * lands included in any reservation, by any treaty, law, or proclamation of the President of the United States." The wording of the orders simply followed this provision, and should not be read as cryptic support for the defendant's proffered 1859 date of taking.

Having turned down the Government's appeal, we come to the Indians' complaint that the Commission erred in setting the 1883 enlargement of the Gila River Reservation as the "taking" date. Those appellants say that, at least until the Taylor Grazing Act of 1934, the only cutting off of aboriginal title occurred by the individual entries of settlers, tract by tract, onto the land in the award area.[9]

■ Once it had decided—properly, as we have found—not to accept 1859 as the time of taking, the Commission was faced with a difficult task. Unlike some other cases, there was here no formal cession by the Indians, no express indication by Congress (or its delegate) of a purpose to extinguish at a specified time, and no single act (or contemporaneous series of acts) of the Federal Government which indisputably erased native ownership at one swoop. The Indian appellants say that, in these circumstances, the presumption of the *Santa Fe* opinion requires the tribunal to hold that there was no general taking at all until some unequivocal action by Congress (such as, they concede but only *arguendo*, the Taylor Grazing Act of 1934). We think, however, that this is a case in which the history of the award area is such that the Commission could permissibly stop short of an uncontroverted and unmistakable sign from Congress.

The background of the 1859 statute, as we noted above, suggests that that Congress wished to protect just the then-existing Pima-Maricopa villages and fields, not all the territory they were using and occupying in Indian fashion. The later enlargements came about, as the Commission found, because federal officials recognized, from time to time, that the reservation as it existed at such times did not cover or protect land the Indians needed and were using. *See* footnote 6 and the adjoining text, *supra*. The Commission also found (24 Ind.Cl.Comm. at 334): "In impressing upon Washington the necessity to enlarge the original 1859 reservation, government agents repeatedly referred to the injustice being done to and the severe hardships being experienced by the Pimas and Maricopas in allowing their tribal land to be taken [by settlers] and irrigation waters to be diverted." The successive enlargements carried on the process begun by the 1859 Act and were designed to include within the Pima-Maricopa reservations the land which federal officials considered, at those periods, that the Indians were continuing to need, use and occupy.

If the Commission had chosen 1915, the date of the last enlargement when the Gila River Reservation reached its present size, it would perhaps be easier to see more clearly the end to this process of extending the reservation to cover the territory the Government deemed the Indians' rightful land. The reservation then reached its ultimate form, and in that shape was probably co-terminous with the area then thought by the Government, perhaps wrongly, to belong to the Indians. At that moment, it could be said, the Government called a final halt because in its eyes the Pima-Maricopa group did not own the territory outside of the reservation, and any Indian claim to it was and should be rejected.

Instead, the Commission chose 1883 when the reservation was doubled (from 180,000 to 360,000 acres), bringing it to within 12,000 acres of the 1915 (and

---

9. The Commission held and the Indians agree that, for the period up to 1883, their ownership was abolished as to individual tracts on the date of entry, even if prior to 1883.

present) size of 372,000 acres. This 1883 addition was about two and a half times the size of the original 1859 reservation (64,000 acres), and with it the reservation attained about 96–97% of its current extent. Recommending the enlargement, the Commissioner of Indian Affairs reported that the cognizant Indian Agent "says an absolute necessity exists for the enlargement of the reservation to the end that all lands in cultivation by the Indians may be reserved from white settlement, and that the Indians may have ample grazing for their 13,000 ponies. All the land included in the proposed extension is now occupied by the Indians for grazing purposes, their reservation not affording anything like a sufficient range for their stock— horses, ponies and beef cattle—which they own in very large numbers, if we except the latter, which according to the Agent's report for the present year, number about 1,000. He urges, further, that there are several Indian villages outside the limits of the present reservation, inhabited during the winter season by the Pimas. Being off the reservation during that time, he cannot exercise control over them, either to protect them or punish wrong doing. The tract wanted as an addition to the reserve includes these villages. It also affords a very large supply of mesquit beans upon which the Indians depend almost entirely for their food supply for a period of about two months of every year." Thus, the 1883 extension was clearly an effort to keep for the Indians the lands they were then occupying and using.

It is relevant, too, in determining the intended impact of this enlargement on aboriginal rights that by that time the settlement of Arizona Territory had increased considerably. "Between 1874 and mid-1880, approximately 140,000 acres were patented at the Florence office. By 1880, Federal census figures show that the population of the entire territory had risen to about 40,000" (from about 9,500 in 1870). 27 Ind.Cl. Comm. at 19. The letter of the Commissioner of Indian Affairs urging the 1883 extension was at pains to point out "that no settlers nor ranches will be included in the extension, save only a few trading stores" and the traders "are occupying no lands for agricultural purposes." It is not far afield to infer that the Government was very aware of the extent and potentiality of settlement at that period.

In the presence of these elements and the absence of any sharp cutting-off date, we hold that the Commission had discretion to choose the 1883 event. We are satisfied that aboriginal title of the whole award area (in land not entered by individual settlers) did not continue undisturbed up until 1934 (or to the present time). At some point in the on-going process, begun in 1859, of carving out for the Pima-Maricopa tribes the lands which were clearly theirs, the Government must have concluded, for itself, that the end had been reached—that the reservations now included everything to which the Indians were properly entitled. But there is no "legal" or mechanical or guaranteed method for fixing an exact date within the time-span commencing with 1859. The determination of the precise point is a matter of judgment, selection, and evaluation, resting on an over-all appraisal of the several facts and factors. There is no text of statute or treaty or other document to supply the answer; nor is there any dispositive judge-created rule of decision. In these circumstances it seems immaterial whether the issue of the taking-date be called one of law, or of fact, or a mixed question; what is critical is that there must of necessity be discretion and leeway to pick a particular date within a reasonable range. As the expert in this field charged with primary responsibility, the Commission is the tribunal to exercise this discretion; all the court can or should do is to oversee and keep it within rational bounds. *Cf.* Snake or Piute Indians v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241, 254–255 (1953).

We have tested the determination below in this light and cannot find the

taint of abuse of discretion or unreasonableness. The combination of circumstances surrounding the massive enlargement of 1883 distinguish it from the prior extensions and those that followed. It was rational to conclude that with that Executive Order the Government believed that all the rightful Pima-Maricopa land was now within the reservations.[10] With respect to the later orders (which added only 12,000 acres, some 3 or 4%), the Commission could allowably view them as minor adjustments in boundaries or as after-thought additions to a reservation considered to have already been fully completed in 1883. These conclusions would lie within the realm of reason.

■ One problem remains—an issue not broached by the parties. It is settled that the supreme power to extinguish Indian title is vested in Congress (United States v. Santa Fe R. R., *supra*, 314 U.S. at 347, 62 S.Ct. 248; Turtle Mountain Band of Chippewa Indians v. United States, *supra*, 490 F.2d at 945–947, 203 Ct.Cl. at ——; *cf.* Oneida Indian Nation of New York v. County of Oneida, 414 U.S. at 661, 94 S.Ct. 772 (1974), but the 1883 enlargement was the result of an Executive Order of the President. His act was, however, both authorized and ratified. Congress later impliedly ratified the Presidential action by appropriating funds for the maintenance of the enlarged reservation. *See, e. g.,* Act of July 4, 1884, 23 Stat. 76, 93; Act of March 3, 1885, 23 Stat. 362, 363, 379. And, as we noted *supra*, the President had authority in the Pre-emption Act of 1841 to establish and enlarge Indian reservations in order to prevent white encroachment on tribal lands.[11] In the context of this history, it is proper to imply a Congressional delegation of some of its plenary power over

Pima-Maricopa affairs to the executive branch (which clearly took the major initiative here), and likewise to find Congressional ratification of the 1883 extension.[12]

For these reasons, the orders and determinations of the Indian Claims Commission, insofar as appealed from, are

Affirmed.

NICHOLS, Judge (concurring):

I join in the opinion and judgment of the court, with the caveat that in my view nothing happened in 1883 that could have constituted a taking of these Indians' heritage, at least not in the traditional eminent domain sense. In a true Fifth Amendment case such looseness in fixing a taking date would be unacceptable, even though at times it must be a jury verdict sort of thing as to the exact hour. Drakes Bay Land Co. v. United States, 424 F.2d 574, 191 Ct. Cl. 389 (1970). Here, however, we are not talking in an eminent domain sense and we are dealing with an "extinguishment" of aboriginal title rather than a true taking. The idea that the Commission has a broad discretion to choose among a number of conceivable dates, in the situation we have here, has the sanction of necessity. An extinguishment date we must have. Yet the truth is, we know the Indians once had their 3,751,000 acres and by 1946, by common understanding, had them no longer, but when they lost them defies determination. The United States was acting, it was at all times supposed, with undeviating benevolence. The idea of expropriation was never entertained, yet in a fit of absentmindedness the deed was somehow done.

I have urged elsewhere that the Indian Claims Commission Act of 1946, 25 U.S.C. § 70 and ff, vests the Commission

10. We are not, of course, holding that the Government's view was correct.

11. The Pre-emption Act was extended to cover this territory by § 7 of the Act of July 22, 1854, 10 Stat. 308.

12. In a distinctively different statutory and factual context, other legal consequences may follow from executive action with reference to reservations. *See* United States v. Santa Fe R.R., *supra;* Turtle Mountain Band of Chippewa Indians v. United States, *supra.*

with jurisdiction over all possible pre-1946 Indian claims and discretion to fashion a monetary remedy whenever the claim has appeal to the moral sense. (Dissenting in Fort Sill Apache Tribe v. United States, 477 F.2d 1360, 201 Ct.Cl. 630 (1973).) The use of average, composite, or jury verdict taking dates is an accepted example of the powers the Commission has. United States v. Northern Paiute Nation, 490 F.2d 954, 203 Ct.Cl. —— (1974). The Commission is not a court but a body in the executive branch. The task of righting Indian wrongs was characterized long before the 1946 Act as not judicial but political. United States v. Choctaw Nation, 179 U.S. 494, 21 S.Ct. 149, 45 L.Ed. 291 (1900). Under the Act the task is made to look primarily judicial, but management rather than adjudication must occasionally be the dominant theme. They must at times adjudicate the unjusticiable. We must approach our tasks of judicial review with our minds wary of legalisms and tolerant of the compromises legalism must make if these ancient wrongs are to be settled in any of our lifetimes. Our decision herein satisfies me on these stated grounds.