The UNITED STATES

v.

**PUEBLO OF SAN ILDEFONSO et al.**

No. 7–73.

United States Court of Claims.

April 16, 1975.

S. Bobo Dean, Washington, D. C., for appellees; Darwin P. Kingsley, Jr., and Karelsen & Karelsen, New York City, attorneys of record for appellees; Richard Schifter and Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., of counsel.

A. Donald Mileur, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for appellant; Roberta Swartzendruber, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and DAVIS and SKELTON, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

DURFEE, Senior Judge:

These cases are before the court on an interlocutory appeal by the Government from a decision of the Indian Claims Commission, rendered on May 9, 1973, and reported in 30 Ind.Cl.Comm. 234 (1973). The three Indian pueblos of San Ildefonso, Santo Domingo and Santa Clara filed claims with the Commission, pursuant to clause 4 of section 2 of the Indian Claims Commission Act,[1] to recover compensation for the extinguishment

---

1. Title 25 U.S.C. § 70a (1970) provides, in pertinent part, as follows:

"The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States * * * (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; * * *."

of aboriginal title to their lands in northern New Mexico. Each pueblo's claim is separate and distinct; the claims are not consolidated, but have proceeded together for convenience in dealing with common issues.

The first issue we are asked to pass upon is whether the Claims Commission erred in ascertaining the dates on which the United States extinguished Indian title to appellees' ancestral lands. Prior to trial the parties entered into stipulations whereby it was agreed that each of the pueblos aboriginally and exclusively used and occupied certain areas delineated on maps by the Bureau of Land Management; it was further agreed that the United States is liable to each of the pueblos for extinguishing aboriginal title to those lands. Trial was held to determine the date or dates of "taking." Evaluating all the evidence, the Commission found that extinguishment of appellees' aboriginal occupancy areas was effected by (1) conveyances under the public land laws to various grantees at different times; (2) inclusion in the Jemez Forest Reserve;[2] and (3) inclusion in New Mexico Grazing District No. 1 created under the Taylor Grazing Act.[3] The lands conveyed to third persons under public land laws were held to have been "taken" as of the dates of entry (or, for mineral claims, as of the patent dates). The various parcels of Indian title lands included in the Jemez Forest Reserve were held "taken" on October 12, 1905, the date the Reserve was created. The areas placed within the Taylor Grazing District were held "taken" on June 12, 1941, the date the district was established.[4] The Government urges us to set aside these determinations and to substitute its recommended taking dates for those found by the Commission.

The second issue presented is whether the Commission erred in holding that the pueblo of Santo Domingo (plaintiff in Docket No. 355) is entitled to recover compensation for the extinguishment of its Indian title interest in a certain 8,600-acre tract of land. The Commission's holding is based upon a finding that the pueblo of Santo Domingo and the pueblo of San Filipe held "joint aboriginal title" to this tract prior to June 13, 1902, when it was set aside by Executive Order for the exclusive use of the San Filipe Indians. The Government attributes legal error to the Commission's reliance upon the principle of "joint aboriginal title;" it also challenges the sufficiency of the evidence to support the conclusion that the two Indian pueblos had exclusive use and possession of the 8,600-acre tract for a long period of time prior to 1902.

For the reasons which follow, we sustain the determinations of the Commission in all respects.

## I. *Dates of Taking*

Dissatisfied with the valuation dates set down by the Commission, the Government has submitted two alternative theories as to when Indian title to appellees' aboriginal lands was extinguished. The first argument is that Congress manifested an intent to abolish aboriginal ownership to the lands in question by passage of the Act of July 22, 1854, 10 Stat. 308, and the Act of December 22, 1858, 11 Stat. 374. The Government's alternative position is that non-Indian interference with the appellees' exclusive use and occupancy of ab-

---

2. By proclamation of October 12, 1905, President Theodore Roosevelt established the Jemez Forest Reserve under the authority of section 24 of the Act of March 3, 1891, ch. 561, 26 Stat. 1103, as amended 16 U.S.C. § 471. By Executive Order of President Wilson, dated April 16, 1915, it was merged with the Pecos National Forest and the combined forest was named Santa Fe National Forest.

3. Grazing District No. 1 in the state of New Mexico was established by order of the Secre-

tary of the Interior on June 12, 1941, issued under the authority of section 1 of the Taylor Grazing Act, 43 U.S.C. § 315. *See* 6 Fed.Reg. 3040 (1941).

4. Certain areas of aboriginal title lands in the Santa Clara case which were not included in the original district were brought in by an order extending the district boundaries on December 14, 1944, and that date was held to be the proper valuation date for those areas.

original title areas was so substantial by 1905 as to effectuate the destruction of aboriginal ownership no later than that year.

The task of setting a date for the extinguishment of Indian title must be approached with certain fundamental principles in mind. The threshold rule, of course, is that termination of Indian title is exclusively the province of the United States. Oneida Indian Nation of New York v. County of Oneida, 414 U.S. 661, 669, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); United States v. Santa Fe Pacific RR, 314 U.S. 339, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941); Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543, 586, 5 L.Ed. 681 (1823). And in this regard, the "power of Congress * * * is supreme." Santa Fe, supra, 314 U.S. at 347, 62 S.Ct. 248. Another familiar principle is that the time fixed for the "taking" of specific lands depends upon the particular facts, circumstances and history of each case. See Santa Fe, supra, 314 U.S. at 357–58, 62 S.Ct. 248. This court was compelled to give emphasis to this rudimentary point in its recent decision in Turtle Mountain Band of Chippewa Indians v. United States, 490 F.2d 935, 946, 203 Ct.Cl. 426, 446 (1974), and Gila River Pima-Maricopa Indian Community v. United States, 494 F.2d 1386, 1389, 204 Ct.Cl. 137, 142 (1974), cert. denied Nov. 18, 1974. An additional doctrine embedded in Indian jurisprudence, observed by the Supreme Court in the Santa Fe case, is that " * * * an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." Id. 314 U.S. at 354, 62 S.Ct. at 255. These principles are the essential benchmarks which serve to guide our assessment of the Government's recommended dates of taking.

The Government says that Congress manifested an intent to extinguish appellees' aboriginal title in 1858. The starting point of the Government's analysis is the Act of July 22, 1854, 10 Stat. 308. By section 8 of that enactment Congress directed the Surveyor General for New Mexico "to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico"; and to "make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo * * * denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States"; and further to "make a report in regard to all pueblos existing in the Territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos, respectively, and the nature of their titles to the lands." The Act also provided that the "report shall be laid before Congress for such action thereon as may be deemed just and proper, with a view to confirm bona fide grants, and give full effect to the treaty * * *."

The Surveyor General submitted his report, dated September 30, 1856, wherein he recommended approval of the claims of some 13 pueblos (including those of the pueblos involved in this action) to lands granted by prior sovereigns. These pueblo land grants were subsequently confirmed by Congress by the Act of December 22, 1858, 11 Stat. 374, and patents were authorized to issue "* * * as in ordinary cases to private individuals * * *." It is the Government's contention that the 1858 Congressional confirmation of these grants extinguished the aboriginal title of the pueblos to all outlying areas. Reliance is placed upon the Santa Fe decision of the Supreme Court, supra, where it was held that the creation in 1883 of the Walapais Indian Reservation at the request of the Walapais, and its acceptance by them, amounted to relinquishment of any tribal claims which they might have had to lands outside the reservation. The Government also directs our attention to numerous cases wherein the Claims Commission has held that the establishment of a reservation for an Indian tribe constitutes a relinquishment of aboriginal

title claims outside of the reservation. It is argued that the 1858 Congressional confirmation of the grants of prior sovereigns was tantamount to the creation of a reservation for the pueblo Indians, and that Congress thereby manifested an intent to extinguish aboriginal title to all areas outside the boundaries of the confirmed grants.

■ It should be clear by now that the creation of an Indian reservation does not invariably extinguish aboriginal title claims to outlying areas. In *Santa Fe, supra*, the Supreme Court dispelled any notion that the establishment of a reservation automatically destroys Indian title claims based upon aboriginal ownership. *See, id.*, 314 U.S. at 351–56, 62 S.Ct. 248. As this court has most recently stated in *Gila River, supra*, 494 F.2d at 1390, 204 Ct.Cl. at 144: "[t]here is no Procrustean rule that the creation of a reservation rigidly stamps out aboriginal rights." The particular facts and circumstances surrounding the establishment of a reservation in a given historical context may be such that that event will be deemed to have constituted a relinquishment of tribal claims to lands outside the reservation. But the rule to be followed, as succinctly and well stated by the court in *Turtle Mountain Band, supra*, 490 F.2d at 946, 203 Ct.Cl. at 446, is that " * * * Indian settlement on a reservation should be seen as an abandonment of claims only when the specific circumstances warrant that conclusion."

■■ In the instant case, there is no indication that Congress had in mind the extinguishment of the pueblos' aboriginal ownership rights when it passed the Act of December 22, 1858. The sole purpose for that legislation was to formally approve and sanction the *bona fide* grants of prior sovereigns, and to authorize the issuance of patents therefor. Contrary to the Government's contention, the Act of December 22, 1858, did not "give" any lands to these pueblo Indians, but merely validated title to lands which the pueblos already owned. The United States was obliged under principles of international law to confirm the *bona fide* grants of prior sovereigns in order to give effect to the 1848 treaty with the Republic of Mexico. *See* Treaty of Guadalupe Hidalgo, Art. viii, 9 Stat. 922, 929 (1848); Beard v. Federy, 70 U.S. (3 Wall.) 478, 491–92, 18 L.Ed. 88 (1866). Thus the circumstances in this case are significantly different from the situation where the Government sets aside land for the establishment of an Indian reservation without any legal duty to do so. We agree with the conclusion of the Claims Commission that "[t]o hold, in these circumstances, that the plaintiffs' acceptance of the patents extinguished their aboriginal title to outlying areas would be equivalent to stating the United States made them pay for what they already owned and what it was already solemnly obligated to confirm." 30 Ind.Cl.Comm. at 239. Nowhere is there to be found any implication that Congress intended to exact the relinquishment of the pueblos' aboriginal rights as the price for confirming their land grants from prior sovereigns. Nor, turning the coin around, is there any proof that the pueblo Indians agreed to abandon aboriginal claims in their ancestral homeland by accepting the patents issued in confirmation of these grants. Indeed, the Commission specifically noted the Government's failure to show any actual abandonment in 1858 of lands previously used. 30 Ind.Cl.Comm. at 240.

As mentioned earlier, we are bound not to violate the Supreme Court's proscription against lightly implying an extinguishment of aboriginal title. *See Santa Fe, supra*, at 354. Since the Government has failed to adequately show that the 1858 confirmation of prior land grants was intended by Congress to extinguish Indian title lands outside the boundaries of the confirmed grants, or that the pueblo Indians agreed to renounce their aboriginal claims by accepting patents issued in confirmation of those grants, we cannot say that the Commission erred in refusing to adopt the Government's recommended 1858 date of taking. *Cf. Turtle Mountain Band, supra*, 490 F.2d at 947, 203 Ct.Cl. at 447.

In an attempt to bolster its suggested taking date, the Government argues that after 1858 the Congress and the Executive Branch dealt with the pueblo aboriginal areas as part of the public domain. As evidence of this, the Government observes that all areas outside of those claimed under Mexican and Spanish grants (by Indian pueblos and by others) were opened up to white settlement by section 7 of the Act of July 22, 1854, 10 Stat. 308. Actual entries onto the pueblos' aboriginal areas did not occur, however, until 1870 and thereafter.

■ It will be observed, first of all, that during the second half of the 19th century, the national policy of respecting unextinguished aboriginal title was in effect in New Mexico. On May 31, 1884, the General Land Office adopted a circular instructing its field officers "to peremptorily refuse all entries and filings attempted to be made by others than the Indian occupants upon lands in the possession of Indians who have made improvements of any value whatever thereon." [5] When the circular was reissued in 1887, and again in 1903, it applied with respect to " * * * lands in the possession, occupation and use of Indian inhabitants, or covered by their homes and improvements." [6] The circular was made expressly applicable to "every land district * * * in any part of the public-land States and Territories." Moreover, when Congress established the Court of Private Land Claims in 1891 to pass on the validity of alleged Spanish and Mexican grants in New Mexico, it provided:

No claim shall be allowed that shall interfere with or overthrow any just and unextinguished Indian title or right to any land or place [Act of March 3, 1891, c. 539, 26 Stat. 860].

It is our view that the Commission correctly concluded that there was no intent during the last half of the 19th century to make all of appellees' aboriginal areas legally open to entry.

■ But even if the aboriginal title areas of these pueblos were open to entry, it does not automatically follow that Indian title was destroyed prior to actual entries upon the various tracts of land. We know that the process of surveying lands and performing other deeds in anticipation of future white settlement does not itself affect Indian title. Plamondon v. United States, 467 F.2d 935, 937–38, 199 Ct.Cl. 523, 528–29 (1972). Nor is the bare expectation that lands will be settled sometime in the future sufficient to deprive Indian dwellers of their aboriginal rights. *Gila River, supra,* 494 F.2d at 1391, 204 Ct.Cl. at 145; *Cf.* Lipan Apache Tribe v. United States, 180 Ct.Cl. 487, 494 (1967). Making lands available for white settlement could, of course, in an appropriate factual context, constitute termination of aboriginal ownership. *See Gila River, supra,* 494 F.2d at 1391, 204 Ct.Cl. at 146. But that result does not obtain in the present case. The opening of lands ceded by Mexico to white settlement was merely an act in recognition of the inevitable western migration and eventual settlement of white homesteaders. This formal acknowledgement that the territory acquired from Mexico would sooner or later be used and occupied by migrating white settlers does not translate into a present intention on the part of Congress to destroy Indian title. Nor does the opening of these lands to settlers under the public land laws signify, as the Government would have it, that Congress intended the 1858 confirmation of the pueblo land grants to effectuate the extinguishment of the Indians' aboriginal ownership rights. There is simply an insufficient factual basis in the record for the Government to draw persuasive support for its 1858 taking date from the fact that large areas of land acquired

---

**5.** *See* 3 Lands Decisions 371 (1884).

**6.** *See* 6 Lands Decisions 341 (1887); Circulars and Regulations of the General Land Office, United States Government Printing Office,

Washington: 1930, pp. 651–52; 43 C.F.R. § 2013.6 (1970). Contrary to the Government's assertion, the 1887 and 1903 circulars are not limited in application to lands on which improvements have been made.

from Mexico were thrown open to white settlement.

This brings us to the Government's second and alternative theory as to when appellees' Indian title was extinguished. The argument is that by 1905 the interruption of non-Indians—caused by white settlement under the public land laws together with land grants to non-Indians by prior sovereigns—had constituted such a "serious intervention" with the appellees' exclusive use and occupancy of their aboriginal title areas so as to effectuate an extinguishment over the entire area.

■ The first point to be made, of course, is that there are no fine spun or precise formulas for determining the end of aboriginal ownership. Unquestionably, the impact of authorized white settlement upon the Indian way of life in aboriginal areas may serve as an important indicator of when aboriginal title was lost. But such authorized settlement is only one of various factors to be considered in determining when specific lands were "taken." *Gila River, supra,* 494 F.2d at 1391, 204 Ct.Cl. at 146.

The Government placed in evidence certain maps and excerpts from the records of the Bureau of Land Management showing the claims, applications, and entries on file prior to 1906. On the basis of all the evidence, the Commission found that there were fairly numerous intrusions into the western part of the San Ildefonso area and the southern and extreme eastern parts of the Santo Domingo area; that they consisted largely of coal declaratory statements and mineral entries; that in each case the parcels adversely claimed make up much less than one-half of the total acreage; that in the case of Santa Clara, there was intrusion into only one fractional section at the extreme northeastern corner of the aboriginal title area; and that the witness who compiled the maps and excerpts was unable to state which claims and entries went to patent, and which were cancelled, rejected, or abandoned. These determinations are not challenged on appeal. In view of the acknowledged

national policy of respecting unextinguished Indian title, which was in effect in New Mexico, and in the absence of any clear and convincing evidence of an intent to extinguish the property rights of the friendly farming Indians of the Southwest, the Commission inferred an intent on the part of the United States to protect the rights of these pueblo Indians. 30 Ind.Cl.Comm. at 242. Further, the Commission concluded, in the circumstances here involved, that the fact that some entries were allowed in the plaintiffs' aboriginal areas is evidence of official negligence, or lack of knowledge of the plaintiffs' areas, rather than of an intent on the part of the United States to abolish their whole titles. 30 Ind.Cl.Comm. at 242. Accordingly, the Commission rejected the Government's theory that the appellees' Indian title to their entire aboriginal areas was extinguished by 1905.

■ The evidence presented to the Commission has been carefully examined, and the Government's argument in support of its proffered 1905 taking date has received serious consideration. We find ourselves in agreement with the Claims Commission that the Government failed to show the destruction of Indian title over appellees' entire aboriginal regions by 1905. Considering the various factors involved—including the extent of authorized settlement in the pueblos' aboriginal areas between 1870 and 1905 (together with the confirmed grants awarded by prior sovereigns), the declared policy in New Mexico of protecting unextinguished Indian title, the absolute dearth of evidence indicating an express Congressional purpose to abolish Indian title over the whole of appellees' ancestral homelands, and the lack of any clear and convincing evidence from which to imply an intent to terminate the pueblos' entire aboriginal ownership—we are unable to conclude that appellees' aboriginal ownership was completely extinguished by the year 1905. On the basis of the record before us, we cannot say that the Commission erred in refusing to select the Government's suggested 1905 valuation date.

As previously mentioned, the Commission ascertained that appellees' aboriginal lands were "taken" on the following occasions: (1) The several dates on which third persons entered lands conveyed to them under the public land laws (or the patent dates, with respect to mineral claims); (2) October 12, 1905, the date on which the Jemez Forest Reserve was created and various parcels of Indian title land were included therein; and (3) June 12, 1941, the date on which pueblo areas were placed within the New Mexico Grazing District No. 1.

The Government attacks the method by which the Commission has determined when Indian title to the pueblo lands was extinguished. Specifically, the Government objects to the selection of the "multitude of scattered dates" when entries were made onto areas under the public land laws. The Government says that Indian or aboriginal title, by its nature, is not divisible into sections or quarter-sections, and it is not subject to extinguishment on a piecemeal, checkered basis. We are asked to ascribe error to the Commission's approach.

 In each case, the Claims Commission weighs all the evidence and endeavors to determine at what point in time the United States extinguished aboriginal title to Indian lands. We must have a date (or dates) in order to place a value on the property taken, so that the Indian claimants can be compensated for the Government's past wrongs. The evidence in some cases will support a determination that at a specific point in time—on a date certain and definite—Congress clearly and unmistakenly manifested an intent to appropriate Indian lands and to wipe out all aboriginal rights. In other cases, the Congressional purpose is not so plainly exhibited; but the facts and circumstances in a given historical context may be such that the Commission, in its sound discretion, might reasonably and rationally choose a single date (or dates) as the most logical time to infer confiscation by the Government of all aboriginal lands. In still other cases, such as the one before us,

the record is devoid of any single occurrence or incident to serve as the event when the United States decisively and all at once grasped a tribe's aboriginal ownership rights in their entirety. The fact is, of course, that the Government repeatedly dealt with Indian lands on a piecemeal basis. In the instant case, the United States allowed and sanctioned—over a period of several decades beginning around 1870—the intrusion of white settlers and miners onto appellees' aboriginal lands. The encroachment was gradual; the native Americans were displaced over a period of many years. In circumstances such as those presented here, it is entirely consistent with reality for the Commission to find that aboriginal lands were "taken" on the dates of the various entries under the public land laws. Confronted with this type of record, the Commission has resorted to practical solutions. The parties have been encouraged to confer and agree upon an "average" valuation date, or a series of "average" dates, for the groups of dispositions made during successive periods. *See* 30 Ind.Cl.Comm. at 255. Such a procedure has received the sanction not only of this court, United States v. Northern Paiute Nation, 490 F.2d 954, 957, 203 Ct.Cl. 468, 473 (1974), but of the Supreme Court as well. Creek Nation v. United States, 302 U.S. 620, 622, 58 S.Ct. 384, 82 L.Ed. 482 (1938). Fixing a date for the extinguishment of Indian title is not always an exact process; in this area of the law, approximations must be tolerated. The determinations of the Commission—the body primarily charged with the administration of the Indian Claims Commission Act—should be given great weight if reasonable. *Gila River, supra,* 494 F.2d at 1393, 204 Ct.Cl. at 150.

 The dates chosen by the Commission in the present case find rational support in the record. In selecting the dates on which third persons entered Indian lands under the public land laws—and in choosing the patent dates for mineral claims—the Commission has not overstepped the limits of its permissible discretion. We are satisfied that these dates, as well as the dates when aborigi-

nal areas were included in the Jemez Forest Reserve and the New Mexico Grazing District No. 1, should serve as the applicable taking dates for determining the value of appellees' former lands.

## II. *The San Filipe Indian Reservation*

The Indian Claims Commission determined that the pueblo of Santo Domingo and the pueblo of San Filipe held "joint aboriginal title" to a certain 8,600-acre tract of land, and that the United States extinguished the Santo Domingo one-half interest in the land on June 13, 1902, by the establishment of an Executive Order reservation for the exclusive use of the San Filipe Indians. The Commission concluded, accordingly, that the pueblo of Santo Domingo is entitled to recover compensation from the United States in an amount equal to one-half of the fair market value of the 8,600 acres as of June 13, 1902.

It is appropriate to briefly recite certain historical facts and events which pertain to the land area in question. On September 10, 1770, representatives of the neighboring pueblos of Santo Domingo and San Filipe submitted a joint petition to the Spanish Governor and Captain General of New Mexico seeking to obtain a land grant from the Spanish Crown. It stated in pertinent part:

* * * That whereas, we have some horned cattle, sheep and goats, and also herds of horses for the service of the King our Master (whom may God preserve) and not having sufficient lands on which to pasture the same; therefore we humbly request that your Excellency be pleased to cede to us in grant, in the name of the King our Master, whom may God preserve, a piece of land situate on the East side of the Rio del Norte, surplusage of each Pueblo, and bounded on the north by Lo de Vasques, on the South by the small spring of water called the bear spring, on the East, an ancient Pueblo called the Tunque Pueblo, and the West, the Rio del Norte, which piece of land comprises from North to South and from East to West, three quarters of a league * * *.

On the same day, the Spanish Governor and Captain General authorized a grant of the requested lands; and he executed a document which provided, in pertinent part, as follows:

* * * in view of the lands they ask in grant lying between the two Pueblos and that it would be very prejudicial to them should they be granted to any other individual: and the natives of the two Pueblos having been and are at all times ready to render to the King any service required of them, I, the said Governor and Captain General said, that I would grant and do grant in the name of his Majesty (whom may God preserve) the piece of land they apply for, equally between one and the other Pueblo, so that a league being measured to the South from the Pueblo of Santo Domingo, and another to the North of San Filipe, in the middle of the cultivable lands remaining, permanent landmarks shall be placed, in order that each Pueblo may observe its limits; and as respects the remaining pasture and wood lands, they shall be common to both of the aforesaid Pueblos, equally and without any preference * * *.

By the same document, the Spanish Governor and Captain General commissioned and empowered one Bartolome Fernandez, Chief Alcalde and War Captain of the Santo Domingo and San Filipe pueblos, to "give them possession in the customary form."

On September 20, 1770, Don Bartolome Fernandez entered onto the land in question together with the "principal Indians and authorities of the said Pueblos of Santo Domingo and San Filipe." Having read the grant, he measured the land and designated it to the Indians; he "gave them to understand that the pastures and watering places were to be in common to each one of the Pueblos and without preference to either of the Pueblos"; he "took them by the hand and conducted them over said land; they pulled up grass, threw stones to the four cardinal points and we all shouted in a loud voice three times, long live our

King our Master, whom may God preserve * * *."

Since the lands which the two pueblos acquired from the Spanish Crown had never been surveyed, the exact extent of the 1770 grant was uncertain. The evidence in the record shows, however, that both groups of Indians understood the 1770 grant to encompass the 8,600 acres involved in this action, and that they used these lands in common for a long time. In 1898, the two pueblos jointly petitioned the Court of Private Land Claims to confirm their title to the land—including the disputed 8,600 acres—which they believed had been conveyed to them by the 1770 grant. The Court unanimously held that the joint grant was genuine and entitled to confirmation. However, a majority of the Court would confirm only an 1,100-acre tract situated in the northern part of the claimed area. Two Justices dissented from this part of the decision, holding that the Indians were entitled to a much larger area.[7] It is important to note that the tract confirmed by the Court of Private Land Claims is contiguous to the 8,600-acre tract here in dispute.

Shortly after the termination of proceedings in the Court of Private Land Claims, there were attempted encroachments upon the lands claimed by the two pueblos to be within the limits of the 1770 joint grant. On April 8, 1901, a Mexican named Julio Garduno made a homestead entry onto 147.90 acres of land lying largely within the 8,600-acre area involved in this action. The attorney who had represented the United States in the proceeding before the Court of Private Land Claims, W. H. Pope, wrote a letter on May 13, 1901, to the Commissioner of Indian Affairs, wherein he expressed his concern over the Garduno entry and other encroachments upon the lands being used by the two pueblos. Pope stated that while the Court of Private Land Claims was cor-

rect in confirming only 1,100 acres under the 1770 grant, the decision "undoubtedly leaves out a large amount of land that the Indians have claimed for many years." He pointed out that the lands taken by Garduno had been under the occupancy and cultivation of the Indians. Coal had been discovered in the vicinity, and it was Pope's belief that entries could be anticipated onto a large part of the premises claimed by the two pueblos but left out of their confirmation. "Should this be done," he observed, "it will be most unfortunate as it will lead to a number of controversies between these entrymen claiming under the United States and the Indians claiming under their ancient possession." Pope recommended that the unconfirmed portion of the lands claimed under the 1770 grant, including the 8,600 acres, be withheld from entry and further attempts to initiate or perfect title under the United States. It was suggested that the Department of Interior consider the question of a permanent reservation of these lands for the use and occupancy of the Santo Domingo and San Filipe pueblos.

The lands were temporarily withdrawn from entry and on April 25, 1902, the Secretary of the Interior instructed the Commissioner of Indian Affairs to investigate the matter of the proposed permanent reservation for the two pueblos. The investigation was conducted by Mr. Pope and one Ralph Collins, Superintendent of the Albuquerque Indian School Service, who together visited the lands in question in April of 1902. Both men recommended that the lands temporarily withdrawn for the use and occupancy of the two pueblos should be set aside for the creation of a permanent reservation for the San Filipe Indians alone. In a report submitted to the Commissioner of Indian Affairs, dated May 2, 1902, Pope observed that "the land in question has been of great use to the Pueblos named" (Santo Domingo and San Filipe). He also stated that Gardu-

---

7. An appeal was filed in the Supreme Court on behalf of the two pueblos but was dismissed for lack of prosecution when Congress failed to appropriate funds for the salary of a Special Pueblo Attorney.

no had "no equities which commend him to the Government, certainly none as against the Indians who have had possession of these lands for a very long time." The reason for suggesting the establishment of a reservation for the exclusive use of the San Filipe Indians was explained in the Pope report as follows:

> The Santo Domingos have already a very large holding and an amount of land entirely adequate for their purposes.

Pope also remarked that:

> If the Land Department prefers to make the reservation in favor of the pueblos jointly, I am of opinion that it will not lead to any serious complication as the two pueblos live in comparative amity.

On the basis of the Pope and Collins investigation, and upon their recommendation, the Acting Commissioner of Indian Affairs recommended that a reservation be created solely for the pueblo of San Filipe "as the Santo Domingo Pueblo has already sufficient lands for its requirements." He also recommended that the Garduno entry be held for cancellation. On June 13, 1902, President Theodore Roosevelt signed an Executive Order setting apart the 8,600-acre tract of land here in issue as the San Filipe Indian Reservation.

In light of the above-recited record of events, and on the basis of the other evidence of record, the Commission found that the Santo Domingos and the San Filipes believed, based upon their interpretation of the Spanish grant of 1770, that they had joint title to what is now the San Filipe Executive Order Reservation, and that from at least 1770 down to June 13, 1902, both groups of Indians used and occupied this 8600 acres of land in common. The Commission held that a true "joint aboriginal title" over these lands had been proven.

In order for an Indian claimant to prove aboriginal title, "[t]here must be a showing of actual, exclusive and continuous use and occupancy 'for a long time' prior to the loss of the land."

Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, 177 Ct.Cl. 184, 194 (1966). Proof of these elements involves factual questions, and the findings of the Commission must be upheld on appeal if supported by substantial evidence. Six Nations v. United States, 173 Ct.Cl. 899 (1965); Red Lake, Pembina and White Earth Bands v. United States, 164 Ct.Cl. 389 (1964); Spokane Tribe of Indians v. United States, 163 Ct.Cl. 58 (1963); Sac and Fox Tribe of Indians v. United States, 315 F.2d 896, 161 Ct.Cl. 189, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963). The parties here have focused their attention, and ours, on the requirement of showing "exclusive" occupancy and control over the lands claimed.

Implicit in the concept of ownership of property is the right to exclude others. Generally speaking, a true owner of land exercises full dominion and control over it; a true owner possesses the right to expel intruders. In order for an Indian tribe to establish ownership of land by so-called Indian title, it must show that it used and occupied the land to the exclusion of other Indian groups. True ownership of land by a tribe is called in question where the historical record of the region indicates that it was inhabited, controlled or wandered over by many tribes or groups. Ordinarily, where two or more tribes inhabit an area no tribe will satisfy the requirement of showing such "exclusive" use and occupancy as is necessary to establish ownership by Indian title. See e. g., Iowa Tribe of the Iowa Reservation in Kansas and Nebraska v. United States, 195 Ct.Cl. 365 (1971), cert. denied, 404 U.S. 1017, 92 S.Ct. 677, 30 L.Ed.2d 664 (1972); Six Nations, supra; Sac and Fox Tribe of Indians, supra. However, this court has acknowledged, on several occasions, that two or more tribes or groups might inhabit a region in joint and amicable possession without destroying the "exclusive" nature of their use and occupancy, and without defeating Indian title. Turtle Mountain Band, supra, 490 F.2d at 944, 203 Ct.Cl. at 442;

*Iowa Tribe of the Iowa Reservation in Kansas and Nebraska, supra,* 195 Ct.Cl. at 370; *Confederated Tribes of the Warm Springs Reservation of Oregon, supra,* 177 Ct.Cl. at 194 n. 6; *Sac and Fox Tribe of Indians, supra,* 315 F.2d at 903, n. 11, 161 Ct.Cl. at 202 n. 11.

The Commission's reliance upon the principle of joint occupancy is assailed on two grounds. First, it is said that the pueblo of Santo Domingo and the pueblo of San Filipe were not a single or closely integrated entity and, therefore, as a matter of law, it was impossible for the two pueblos to have held joint Indian title. Second, it is argued that there are neither sufficient findings nor substantial evidence in this record to support a determination that the two pueblos jointly used and occupied the 8,600 acres in question for a long time.

■ The Commission specifically found that the two pueblos were "separate entities," rather than a "super-entity" for the purpose of holding joint title to the subject tract of land. Four members of the Commission do not believe that a complete merger of two tribes into one entity is a prerequisite for applying the principle of joint occupancy. 30 Ind.Cl.Comm. at 355, n. 27. Chairman Kuykendall, on the other hand, who dissented in this aspect of the case, is of the opinion that "joint Indian title" can exist only where two or more tribes have become so closely allied or integrated in their land use and occupancy that they have in fact become virtually one land using entity. He does not believe that the concept is applicable to a situation where two separate entities, each possessing Indian title to its own lands, attempt to assert joint ownership to an area between their respective lands which is commonly used by both groups. 30 Ind.Cl.Comm. at 256–57. The Chairman's stated position is espoused by the Government here on appeal. There are no holdings of this court which say that two Indian tribes or groups, each a separate "entity" and each with its own separate lands, can never assert joint ownership to other lands which are common-

ly used and occupied. *Seminole Indians of Florida v. United States,* 455 F.2d 539, 197 Ct.Cl. 350 (1972), and *Iowa Tribes, supra,* do not stand for the proposition that two or more tribes claiming joint aboriginal title must invariably and indispensably show that they have become, for all purposes, a "single land-owning entity." In *Seminole Indians of Florida, supra,* the issue of joint aboriginal title was not before the court. On the record before us in *Iowa Tribes, supra,* we held that the Iowas and the Sac and Fox may have used lands in common, but that the Commission could properly decide, on the basis of the evidence before it, that their occupancy was not proved to be truly joint, and therefore that each separate tribe's claims to Indian title would have to be tested on its own distinct basis. The *Iowa Tribes* decision did not purport to set down any rule that two or more tribes must first conclusively prove that they are a single or closely integrated entity before they can claim joint ownership of land. In our view, the Commission correctly held that the complete merger of two or more tribes into one is not a prerequisite for claiming joint aboriginal title.

■ There is ample evidence in the record before us to support the conclusion that the pueblo of Santo Domingo and the pueblo of San Filipe jointly used and occupied the disputed 8,600 acre tract for a long period of time.[8] We believe that the Commission could properly decide, on this record, that the two pueblos had "joint aboriginal title" at the time the lands were included in the San Filipe Executive Order Reservation. Both pueblos believed for a very long time that they owned the disputed area in joint tenancy under a 1770 land grant from the Spanish Crown. They asked the Court of Private Land Claims in 1898 to confirm that grant over the entire area in both of them jointly. By a narrow vote, the Court of Private Land Claims confirmed only the northern 1,100 acres, but that area is adjacent to the tract now in dispute and it formed an integral part of the larger tract which the Indians believed they owned in com-

8. The Government's attack upon the sufficiency of the Commission's findings is wholly lacking in merit.

mon. The factual picture which has emerged here adds up to significantly more than mere use and occupancy of a particular area by two or more tribes at the same time. These two pueblos had a joint Spanish grant which they believed to encompass a large area, and although the Court of Private Land Claims did not validate the entire claim, it did validate an area contiguous to the 8,600-acre tract in issue—hence there was a substantial objective basis for the Indians' belief that they jointly owned the disputed land.

Since the Commission's findings are supported by substantial evidence, and since its decision is free from errors of law, the interlocutory orders and determinations appealed from must be, and hereby are

Affirmed.